Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | Philip G. Reinhard |
|---|---|---|---|
| **CASE NUMBER** | 01 C 50247 | **DATE** | 5/23/2002 |
| **CASE TITLE** | | AMICI vs. BARNHART | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] As stated on the attached, it is the Magistrate Judge's Report and Recommendation that Plaintiff's motion for summary judgment be denied. It is further recommended that Defendant's motion for summary judgment be granted. Enter attached Report and Recommendation.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | date docketed |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | docketing deputy initials |
| ✓ | Copy to judge/magistrate judge. | |
| | | 5/23/2002 |
| tml | courtroom deputy's initials | date mailed notice |
| | | gg |
| | Date/time received in central Clerk's Office | mailing deputy initials |

MAY 23 2002

02 MAY 23 PM 3:43
CLERK U.S. DISTRICT COURT

Document Number

IN THE UNITED STATES DISTRICT COURT FILED-WD
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION 02 MAY 23 PM 3: 59

| | | |
|---|---|---|
| ROSEMARY AMICI, | ) | CLERK |
| | ) | U.S. DISTRICT COURT |
| Plaintiff, | ) | Case No. 01 C 50247 |
| | ) | |
| v. | ) | Philip G. Reinhard |
| | ) | P. Michael Mahoney |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff, (Plaintiff), seeks judicial review of the final decision of the Commissioner of the

Social Security Administration (Commissioner). See 42 U.S.C. §§ 405(g), 1383(c)(3). The

Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits (DIB)

pursuant to Title XVI of the Social Security Act (the Act). 42 U.S.C. §1381(a). This matter is

before the Magistrate Judge for Report and Recommendation pursuant to Rule 72(b) and 28 U.S.C.

§636(b)(1)(B).


## I.    BACKGROUND

Plaintiff filed for DIB on December 9, 1994, alleging disability beginning on November 5,

1993. (Tr. 30-33). Plaintiff's application for benefits was denied on March 10, 1995. (Tr. 35-39).

On April 7, 1995, Plaintiff filed a request for reconsideration. (Tr. 40-41). Plaintiff's request for

reconsideration was denied on June 12, 1995. (Tr. 42). Plaintiff then filed a request for a hearing

before an Administrative Law Judge (ALJ) on July 24, 1995. (Tr. 46-47). On January 21, 1997,

Plaintiff's case was remanded to the State agency for further development of Plaintiff's alleged depression. (Tr. 161-163). On June 18, 1997, Plaintiff's application for benefits was again denied. (Tr. 164). On July 2, 1997, Plaintiff again filed a request for a hearing before an ALJ. (Tr. 177). Plaintiff appeared, with counsel, before an ALJ on May 13, 1998. (Tr. 293-319). On December 10, 1998, Plaintiff appeared, with counsel, before the ALJ for a supplemental hearing. (Tr. 320-337). In a decision dated June 15, 1999, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 11-28). On June 30, 1999, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 9). On April 21, 2000, the Appeals Council denied Plaintiff's request for review. (Tr. 7-8).

## II.     FACTS

Plaintiff was born on August 4, 1954, and was 43 years old at the time of the hearing. (Tr. 30). Plaintiff testified that she completed two years of high school. (Tr. 312). Plaintiff has not worked since November 5, 1994. (Tr. 299). Plaintiff testified that she currently lives with her husband and her 21 year old son. (Tr. 305). As to her typical day, Plaintiff stated that she usually gets up at 7 am, she has coffee and reads the paper while her son and husband get ready for work, she lets the dogs out and occasionally watches a little TV. (Tr. 305). Plaintiff testified that she is able to dress herself but that she needs some help with personal hygiene because she is unable wash her hair without assistance. (Tr. 306). Plaintiff stated that she often takes a nap during the day because she does not sleep well at night, she does some cooking, but needs help remembering things and reaching for things and that she does some light dusting and laundry folding, but all the heavy work is done by her son and husband. (Tr. 307). Plaintiff does occasionally go to the store if she needs to pick up a few things and she is able to drive herself, however, she often goes with a

neighbor. (Tr. 308). Plaintiff testified that the last time she was outside of the Chicago area was in 1993 when she accompanied her husband on a business trip to Las Vegas, Nevada. (Tr. 309-310).

Plaintiff stated that the medications she takes does help with her problems and that she does not experience any side-effects from the medications. (Tr. 312). Plaintiff testified that she had been to see a doctor twice during the previous year and that she is not under the care of a mental health specialist. (Tr. 312). In response to questions from her attorney, Plaintiff testified that she does get depressed about her inability to do things and the pain she is in and that she often cries. (Tr. 313). Plaintiff stated that she loved to work and that not being able to work since 1994 had a terrible effect on her personal life. (Tr. 313).

Plaintiff testified that she is able to walk only about 100 feet and that she is afraid of falling is she attempts to walk any further than that. (Tr. 299-300). Plaintiff stated that she is afraid her sciatic nerve will "kick in" and that she has to be very careful of how she turns. (Tr. 299-300). When Plaintiff aggravates her sciatic nerve, she stated it feels like a lightening bolt; pins and needles radiating down, more on the right than on the left. (Tr. 300). Plaintiff testified that she has a back brace, she was wearing it during the hearing, and that even with the brace, she is able to stand for only 10 to 15 minutes at a time. (Tr. 301). Plaintiff stated that after standing for 10 to 15 minutes she needs to sit to rest her lower back. (Tr. 301-302). Plaintiff claimed that she is able to lift no more than about a gallon of milk and that she has to "cradle it" to avoid dropping it. (Tr. 302). Plaintiff testified that she is able to sit for about half an hour and that she would then have to get up and walk around for a few minutes to relieve the muscles in her lower back. (Tr. 303). Plaintiff indicated that she is not able to lift her right arm above shoulder level and that she experiences weakness in both arms. (Tr. 304). Plaintiff is right-handed. (Tr. 296).

In a supplemental hearing on December 10, 1998, Plaintiff's attorney indicated that Plaintiff had been diagnosed with major depression and that she had begun experiencing panic attacks as a corollary to the depression. (Tr. 322). At the supplemental hearing, a vocational expert, Mr. Frank Mendrick, was called upon to assist the ALJ. (Tr. 324). Mr. Mendrick testified that he had reviewed the information contained in the case file and characterized Plaintiff's past work as a kitchen helper position with an exertional level of light, unskilled work. (Tr. 324-326). Mr. Mendrick did note that each store is different and that since Plaintiff had reported that she was required to lift up to 75 pounds, she may have been working at the heavy exertional level. (Tr. 326). The ALJ asked Mr. Mendrick whether an individual who is 44 years old, has an eleventh grade education, can perform light exertion except cannot lift more than ten pounds, cannot do overhead work and cannot perform work requiring production quotas withing rigid time frames can perform unskilled work existing in the national economy. (Tr. 326-327). Mr. Mendrick responded that such an individual could work as a cashier or counter-clerk, ticket taker and information clerk. (Tr. 329). In response to Plaintiff's attorney, Mr. Mendrick stated that some of the jobs he mentioned would provide a sit/stand option, and that whether the individual was able to sit depended on the pace of the customers. (Tr. 331-332). Mr. Mendrick also stated that the indicated positions would involve some time constraints as the individual might have to work more quickly when there are more customers. (Tr. 332). The ALJ then asked Mr. Mendrick, with respect to the indicated positions that involved fingering, whether an individual who was capable of picking up a dime from the floor would be able to perform the fingering required by those positions. (Tr. 334). Mr. Mendrick responded that such an individual would have the capability of performing the fingering functions of those positions. (Tr. 334). Mr. Mendrick also stated that is the individual had difficulty holding things such as tickets and coins in

4

her dominant hand, then she would be incapable of performing the jobs requiring fingering. (Tr. 336).

### III. **MEDICAL HISTORY**

Plaintiff was seen at the Center for Orthopaedic Surgery by Dr. Jeffrey Visotsky, MD, a specialist in hand and upper extremity surgery on November 12, 1993. (Tr. 113-114). Dr. Visotsky indicated that Plaintiff complained of right shoulder, neck and elbow pain for the previous three weeks. (Tr. 113). Dr. Visotsky reported that Plaintiff had the signs and symptoms of mild lateral epicondylitis, mild rotator cuff tendinitis, mild to moderate right hand carpal tunnel syndrome and mild cervical degenerative arthritis. (Tr. 113). Dr. Visotsky recommended that Plaintiff remain off work until she has a workup with EMG/NCV studies. (Tr. 113). Nerve conductivity studies were performed on Plaintiff on December 10, 1993. (Tr. 151-152). Those studies indicated mild bilateral ulnar neuropathies with no evidence of inactive cervical radiculopathy. (Tr. 153). On December 17, 1993, Dr. Visotsky indicated that Plaintiff had refused cortisone injections and that he therefore recommended a structured therapy program. (Tr. 111). Dr. Visotsky reported that Plaintiff could return to work but that she should not use her right arm, should not lift more than a pound and should avoid repetitive activities. (Tr. 111).

On January 29, 1994, Plaintiff was seen for neck, right shoulder and radiating arm pain. (Tr. 84). Plaintiff reported that her hand "gives out" occasionally and she has intermittent right neck and arm pain. (Tr. 84). Treatment notes indicate that Plaintiff had tenderness to palpation low in the cervical spine, diminished right biceps reflex and weakness in the right biceps. (Tr. 84). An MRI of the cervical spine demonstrated protruding disks at C4/C5 and C5/C6. (Tr. 84, 138-139). A CT

myelogram, reported on February 10, 1994, indicated a small, right-sided disk herniation at C4/C5 and a large osteophyte with possible soft tissue disk herniation at C5/C6 on the right side as well. (Tr. 83, 140-141). It was indicated that a discogram be performed and, if positive, that Plaintiff undergo an anterior cervical decompression and fusion. (Tr. 83). A cervical diskography was performed on February 17, 1994, and indicated mild degeneration and the C3-4 level, right sided extravasation of dye at C4-5 and gross degeneration of the disk with bilateral extravasation of the dye at C5-6. (Tr. 142) Notes from March 4, 1994, indicate that a right, anterior diskectomy and fusion were scheduled for March 9, 1994. (Tr. 83). On March 10, 1994, Plaintiff underwent the surgery which entailed the removal of iliac bone crest graft material, incision of the C4-5 and C5-6 disks, removal of protruding disk material, impaction of the graft material and affixation of AO plate. (Tr. 143-144). On March 15, 1994, it was reported that Plaintiff was doing fine following her surgery and continued guarded activity was recommended. (Tr. 83). Notes from March 28, 1994, report that Plaintiff had no significant complaints and that her wounds were healing well. (Tr. 82). On April 25, 1994, Plaintiff complained of neck and right arm discomfort as well as bilateral radiating calf pain with activity. (Tr. 82). Her incisions were well healed and x-rays showed her graft and plate to be in good position. (Tr. 82). Plaintiff expressed concern at having to return to unrestricted work and re-injuring herself. (Tr. 82). On June 6, 1994, Plaintiff appeared somewhat anxious and depressed and complained of intermittent numbness in her right hand. (Tr. 81). It was noted that Plaintiff had excellent strength in the upper extremities but that she had some symptoms of a thoracic outlet syndrome. (Tr. 81). It was recommended that Plaintiff have three more weeks of physical therapy and it was noted that some of Plaintiff's complaints may represent work avoidance behavior. (Tr. 81). On July 8, 1994, Plaintiff was doing well with respect to her neck

surgery and had some complaints of right shoulder discomfort. (Tr. 81). Plaintiff was referred to Dr. Visotsky for a re-evaluation of her shoulder. (Tr. 81). It was indicated that there was no significant reason why Plaintiff could not return to work in a light duty capacity. (Tr. 81). Plaintiff's treating physician indicated that Plaintiff's most recent functional capacity placed her at the sedentary level and that he believed she was capable of more. (Tr. 81). On September 2, 1994, Plaintiff had x-rays taken for a six month evaluation of her cervical spine. (Tr. 80). The x-rays indicated excellent fusion with good range of motion and no tenderness, it was reported that Plaintiff was unrestricted as to her cervical spine and was being treated for a right rotator cuff tear. (Tr. 80).

A report from the Center for Orthopaedic Surgery, dated October 21, 1994, indicated that an independent medical evaluation had been performed by Dr. Visotsky, (Tr. 86-88). Dr. Visotsky indicated that Plaintiff's current diagnosis is status post cervical fusion with symptoms of persistent right shoulder impingement syndrome, possible right rotator cuff full thickness tear, mild symptoms of lateral epicondylitis bilaterally and mild carpal tunnel syndrome. (Tr. 88). Dr. Visotsky reported that Plaintiff was first seen on November 12, 1993, and that she complained of progressive, right shoulder, elbow and neck pain over the previous three weeks. (Tr. 86). The report indicated that after cervical surgery, Plaintiff was seen on July 22, 1994, and that she was having persistent pain in her right shoulder. (Tr. 87). Dr. Visotsky reported a possible focal degenerative tear in the distal supraspinatus tendon. (Tr. 87). Changes were noted in the tendon substance and anti-inflammatories, therapy and cortisone injections (declined by Plaintiff) were recommended. (Tr. 97). Plaintiff was seen again on October 7, 1994. (Tr. 87). Dr. Visotsky reported that Plaintiff was having persistent impingement that was not responding to conservative treatment. (Tr. 87). Exam revealed Plaintiff had limited strength on supraspinatus isolation and pain with impingement maneuvers. (Tr. 87). Dr.

Visotsky recommended open Neer acromioplasty, subacromial decompression bursectomy and exploration of rotator cuff. (Tr. 87). Dr. Visotsky reported that Plaintiff's symptoms fell into the category of cumulative trauma disorders caused by repetitive work activities or exacerbated by a single episode in a work related or nonwork environment. (Tr. 88). Finally, Dr, Visotsky reported that the surgery would not return Plaintiff to her full functional state and that she may have some long-term limitations in activities. (Tr. 88).

On October 31, 1994, Plaintiff underwent a right rotator cuff repair and right subacromial decompression surgery. (Tr. 89-96). Post-surgical treatment notes indicate that Plaintiff began Phase I of the rotator cuff protocol on November 4, 1994, under Dr. Visotsky's care. (Tr. 107). On November 11, 1994, Dr. Visotsky reported that Plaintiff was making good progress and that it was imperative that she begin a structured therapy program. (Tr. 106). Dr. Visotsky indicated that failure to obtain therapy can lead to long term stiffness, protracted problems and increased pain and suffering. (Tr. 106). On December 2, 1994, Dr. Visotsky reported that Plaintiff was making good progress and that it was imperative that worker's comp. approve her therapy to avoid a decrease in Plaintiff's functionality and long term impairment. (Tr. 106). On December 20, 1994, Plaintiff complained of right knee pain; grind test, Apley test and Murray tests were negative and Dr. Visotsky recommended patellar rehabilitation exercises. (Tr. 106). Dr. Visotsky noted on December 30, 1994, that Plaintiff had not yet obtained approval for therapy and that while she was compliant with the home program, her progress was slowed by her inability to participate in a structured therapy program. (Tr. 105). On January 27, 1995, Plaintiff complained of pain in her elbow. (Tr. 105). Plaintiff was given a splint and counterforce brace and instructed as to an exercise program for her elbow. (Tr. 105). On March 27, 1995, it was noted that Plaintiff still had a limited range of

8

motion in her shoulder with external rotation limited to 20 degrees. (Tr. 105). On June 16, 1995, July 14, 1995, and October 20, 1995, Dr. Visotsky reported that Plaintiff had persistent symptoms of adhesion capsulitis/rotator cuff tendinitis. (Tr. 242-243). On April 30, 1996, Plaintiff complained of numbness and tingling in her thumb, index and long finger, lateral epicondylitis and rotator cuff tendinitis. (Tr. 241). X-rays revealed minimal degenerative changes and Dr. Visotsky continued Plaintiff's anti-inflammatory medication. (Tr. 241). On July 30, 1996, Plaintiff complained of low back pain in addition to elbow and shoulder pain. (Tr. 240). Dr. Visotsky referred Plaintiff to Dr. Avi Bernstein for her low back pain. (Tr. 240). Plaintiff was seen on July 22, 1997, by Dr. Armen Kelikian for right leg pain. (Tr. 239). Dr. Kelikian reported that Plaintiff was tender around the distal third, Zone IV of the ankle. (Tr. 239). Plaintiff was seen by Dr. Thomas Gleason, MD, on August 18, 1997. (Tr. 237-238). Dr. Gleason indicated that Plaintiff complained of lower back pain and right leg pain and that there is no evidence of nerve root compression. (Tr. 238).

On April 29, 1994, Plaintiff was seen for complaints of severe leg cramps on both sides. (Tr. 102). Treatment notes indicate that Plaintiff complained of pain in her calf muscles with some tingling sensations. (Tr. 102). Exam revealed a blood pressure of 110/80, pulse rate of 80 beats per minute, respirations, 20 per minute, and no weakness, varicosities or discolorations were noted in Plaintiff's legs. (Tr. 102). It was recommended that Plaintiff see her primary physician, Dr. Palmero regarding her leg pain. (Tr. 102). On September 23 and December 2, 1994, Plaintiff complained of stress and reported that she was extremely anxious and breaking out in hives. (Tr. 98). A note from Dr. Jude Pinto, MD, dated November 28, 1998, indicates that Plaintiff is diagnosed as suffering from panic attacks. (Tr. 260). Dr. Pinto's notes, from March 31, 1997, through December 15, 1998, indicate that he treated Plaintiff for sore throats and a urinary infection. (Tr. 289-290). On November

9, 1998, Dr. Pinto indicated that Plaintiff was feeling tired but was otherwise doing better and that she had had one panic attack that morning. (Tr. 290).

On February 24, 1995, Plaintiff was seen for a one year follow-up of her cervical fusion. (Tr. 156). The treating physician indicated that Plaintiff was doing well with respect to her neck pain, she was contender over the cervical spine and a full ROM, but continued to have shoulder pain that occasionally radiated to her arm. (Tr. 156). The treating physician reported that Plaintiff appeared emotionally stressed and fatigued. (Tr. 156). On February 29, 1996, Plaintiff was seen for a two year follow-up regarding her cervical fusion. (Tr. 157). The treating physician indicated that Plaintiff reported she may be suffering from RSD of the upper extremity and that she has temperature changes and discoloration of her right arm as compared to her left arm. (Tr. 157). Plaintiff appeared drawn and distraught and reported that she had been fired from her job and was involved in litigation. (Tr. 157). As for her cervical exam, Plaintiff had no tenderness and a mild restriction in her ROM; x-rays demonstrated a completely healed fusion and normal cervical alignment. (Tr. 157).

On April 23, 1997, Plaintiff was referred to Dr. Stephen Epner, MD, for a one hour internal medicine evaluation. (Tr. 198-202). Dr. Epner indicated that Plaintiff had a history of cervical fusion, right rotator cuff surgery, carpal tunnel syndrom and a bulging disk in her lower back. (Tr. 198-199). Plaintiff reported a limited ROM in her neck, shooting pain down her right arm, right shoulder pain, weakness in the right shoulder and hand, occasional tremor in the neck, headaches, low back pain that sometimes radiates down her legs and weakness in her legs. (Tr. 198-199). Plaintiff reported that standing, walking, bending, sitting and lifting increases her back pain, that the pain wakes her up at night, that she can walk only ten minutes before she has to stop or rest and that she does use a cane or crutch. (Tr. 199). Dr. Epner listed Plaintiff's medications as Vicodin, Lodine

10

and Xanax. (Tr. 199). Dr. Epner reported that Plaintiff walked unassisted, she wears a brace on her

right wrist and hand and was alert and oriented. (Tr. 199). In his musculoskeletal examination, Dr.

Epner found good gross, but decreased fine motor control in Plaintiff's right hand, a limited ROM

in her right wrist and decreased strength and ROM in her right shoulder. (Tr. 200). Plaintiff's left

shoulder and hand were normal. (Tr. 200). As to her cervical spine, Plaintiff could flex forward 10

degrees, extend backwards 10 degrees, rotate her hear 30 degrees right and 40 degrees left. (Tr. 200).

In the lumbar spine, Plaintiff could flex forward 70 degrees and extend backward 15 degrees. (Tr.

200). Dr. Epner reported tenderness to the back during straight leg raises. (Tr. 200). Dr. Epner noted

normal ROM and strength in the hips, knees and ankles. (Tr. 200). Dr. Epner's reported diagnosis

is chronic cervical spine pain, decreased ROM in the cervical spine, chronic headaches, right hand

weakness and pain, considerable right shoulder weakness and low back pain. (Tr. 201).

Also, on April 23, 1997, Plaintiff was seen by Dr. John Conran, MD, for a psychiatric

evaluation. (Tr. 194-197). Dr. Conran saw Plaintiff for 45 minutes for the purpose of conducting

the evaluation. (Tr. 194). Dr. Conran indicated that Plaintiff had reported that she has had problems

with crying spells and constant pain since her work injury in November 1993. (Tr. 194). Plaintiff

reported that she has difficulty sleeping due to pain, that she has lost some weight, has difficulty

preparing food for herself and rests, watched TV and listens to the radio during the day while her

husband is at work. (Tr. 194). Plaintiff indicated that she takes hydrocodone, alprozolam and iodine.

(Tr. 194). Dr. Conran reported that Plaintiff had suffered an injury at work on November 5, 1993,

when she dropped a large skewer used to roast chickens, penetrating her foot and wrenching her

shoulder. (Tr. 194). Plaintiff has had cervical surgery, rotator cuff surgery and currently wears a

brace on her right arm for carpal tunnel syndrome. (Tr. 194). Plaintiff reached the tenth grade in

11

school and worked at Jewel Food Stores from 1973 to 1976 and from 1978 through 1993. (Tr. 195). Plaintiff has one son, twenty years old, and has been married for 24 years. (Tr. 195). Dr. Conran indicated that Plaintiff was appropriately dressed and groomed and was attentive. (Tr. 195). Plaintiff was oriented, sad and often tearful and displayed no evidence of a thought disorder. (Tr. 195). Plaintiff's memory was intact, she was able to perform calculations slowly, had good general knowledge, judgment and abstract thought. (Tr. 195). Plaintiff reported that her daily activities were limited by pain and that her husband and son did many of the household chores. (Tr. 196). Dr. Conran reported that Plaintiff suffers from major depression, recurrent. (Tr. 196).

On February 6, 1995, a Residual Functional Capacity (RFC) assessment was completed on Plaintiff by Dr. Jose Gonzales, MD, a non-treating physician. (Tr. 115-122). Dr. Gonzales found that Plaintiff can lift no more than 20 pounds occasionally and 10 pounds frequently, can sit, stand or walk for six hours in an eight hour work day, is not limited in her ability to push or pull (including the operation of hand or foot controls), cannot climb ladders, ropes or scaffolds, can crawl only occasionally, is limited in her ability to reach overhead with her right arm and has no visual, communicative or environmental limitations. (Tr. 116-119).

An undated form completed by Dr. Visotsky for Plaintiff indicates that the date of her last visit was October 10, 1994. (Tr. 154-155). On that form, Dr. Visotsky indicates that Plaintiff is suffering from a full thickness rotator cuff tear as demonstrated by an MRI. (Tr. 154). Dr. Visotsky reports that Plaintiff has a Class 5 impairment resulting in a severe limitation of functional capacity and that she is unable to perform even sedentary work. (Tr. 155). Dr. Visotsky indicated that it is unknown if Plaintiff would be able to return to her previous job and that it would be six to twelve months before she return to work at any occupation. (Tr. 155).

12

On June 6, 1997, another RFC assessment was completed as to Plaintiff (the reviewer is not listed and the signature is illegible). (Tr. 207-214). In that assessment it is indicated that Plaintiff is post cervical diskectomy, has a weakened right upper extremity and alleges low back pain. (Tr. 207). The reviewer found that Plaintiff is capable of lifting 50 pounds occasionally and 25 pounds frequently and that Plaintiff can stand, sit or walk for six hours in an eight hour work day. (Tr. 208). The reviewer indicated that Plaintiff was limited in her ability to reach and perform fine manipulations with her right arm and hand and had no other limitations. (Tr. 208-211).

A letter from Dr. Visotsky, dated June 17, 1998, states that Plaintiff can work in employment as long as she does not perform power overhead activities. (Tr. 229). Dr. Visotsky reports that Plaintiff is limited to lifting 5 to 10 pounds, performing no overhead or power lifting activities and avoiding activities with repetitive cycles exceeding six per minute. (Tr. 229). Dr. Visotsky also noted that Plaintiff was being treated by other physicians in his office for her low back pain, tendinitis in her foot and cervical degenerative disease, and that he has cared for her solely for her shoulder, elbow and hand problems. (Tr. 229). In another letter, dated September 8, 1997, Dr. Visotsky noted that Plaintiff had some problems with her shoulder rehabilitation due to the failure of her worker's comp. carrier to approve therapy, and while Plaintiff's ROM has improved, she still has some persistent pain. (Tr. 230). Dr. Visotsky wrote that Plaintiff has substantial limitations in overhead lifting, frontal plane lifting and repetitive tasks. (Tr 231).

A Psychiatric Review Technique Form (PRTF) was completed as to Plaintiff on May 28, 1997. (Tr. 165-173). That form indicated that an RFC assessment was necessary and that Plaintiff suffers from an affective disorder. (Tr. 165). The form further indicated that Plaintiff's impairment resulted in slight restrictions in activities of daily living, slight restrictions in maintaining social

13

functioning and deficiencies of concentrations, persistence or pace that occur often. (Tr. 172).

A Mental RFC Assessment was completed as to Plaintiff on May 28, 1997 (again, the reviewer is not identified and his signature is illegible). (Tr. 203-205). That assessment indicates that Plaintiff is moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods and interact appropriately with the general public. (Tr. 203-204). No other significant limitations were noted. (Tr. 203-203).


## IV.  **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F.Supp. 1377, 1384 (N.D.Ill. 1995).

## V. <u>FRAMEWORK FOR DECISION</u>

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

15

techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[1] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[2] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education,

---

[1]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

[2]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.  **ANALYSIS**

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on June 15, 1999. (Tr. 22).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and

the court finds no reason to disturb this finding.  It is the Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step One of the Analysis be affirmed.

B. Step Two:  Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff is status post cervical diskectomy and fusion, has had right rotator cuff repair, has bilateral ulnar neuropathies, depression with infrequent and brief panic attacks, lateral epicondylitis and a history of low back pain. (Tr. 22).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. It is the Magistrate Judge's Report and Recommendation that the ALJ's finding as to Step Two of the Analysis be affirmed.

C.      Step Three:  Does claimant's impairment meet or medically equivalent to an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4.  (Tr. 23).

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it.  Therefore, it is the Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step Three of the Analysis be affirmed.

D.      Step Four:  Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform any of her past relevant work. The finding of the ALJ as to Step Four of the Analysis is not

19

challenged by either party and the court finds no reason to disturb this finding. It is the Report and Recommendation of the Magistrate Judge that the ALJ's determination as to Step Four of the Analysis be affirmed.

E.    Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five The ALJ determined that although Plaintiff's Residual Functional Capacity did not allow her to perform the full range of light work, there existed a significant number of jobs in the national economy that she can perform.   The ALJ determined that Plaintiff had the RFC to perform the functions of work except that she could lift no more than ten pounds, reach overhead or adhere to a rigid time frame for production work. (Tr. 16).  The ALJ found that while Plaintiff alleged residual neck, right shoulder, arm and hand pain, tingling in the right hand, low back and leg pain, upper extremity weakness, depression, and problems with memory, concentration and sleeping, the objective medical evidence does not fully support Plaintiff's allegations. (Tr. 17).  The ALJ noted that while Plaintiff did have a cervical fusion surgery and a rotator cuff repair surgery, the fusion was reported as excellent and stable and the right shoulder continues to have some limitation in ROM, but grip strength is normal in spite of some loss of fine motor control. (Tr. 17).  The ALJ indicated that Plaintiff also had mild epicondylitis, but x-rays show only mild degenerative changes and low back pain with a bulging disk at L5-S1 and a possible small herniation that does not appear to affect Plaintiff's gait, strength or sensation. (Tr. 18).

The ALJ further noted that Plaintiff's reported daily activities are not limited the to the extent expected given her complaints of disabling symptoms. (Tr. 18).  Plaintiff reported that she goes to the grocery store several times a month. (Tr. 18).  The ALJ also noted that Plaintiff was able to drive

20

herself to the hearing in Evanston, Illinois, from her home in McHenry, Illinois. (Tr. 18).

Finally, the ALJ reviewed the medical evidence and noted that Plaintiff's treating physician pronounced her cervical fusion a success and noted that Plaintiff's continuing complaints of problems with her right upper extremity may represent work avoidance behavior. (Tr. 18). The ALJ stated "This negative observation by a treating clinician on the authenticity of his own patient's condition is a potent weapon in degrading a disability seeker's credibility." (Tr. 18). Additionally, while Plaintiff alleges symptoms resulting from major depression, she admits that she has never sought or received professional mental health treatment and she is currently being successfully treated for panic attacks by a general practitioner. (Tr. 19). The ALJ noted that Plaintiff's treating physicians, Dr. Bernstein for her neck and Dr. Visotsky for her shoulder, have indicated that she is able to return to work with some restrictions as to lifting and repetitive work. (Tr. 19-20).

This court has reviewed the record, the ALJ's decision and the submissions of the parties and finds that some of the ALJ's characterizations of the evidence are troublesome but that substantial evidence does exist to support the RFC determination. This court notes that while Dr. Bernstein stated on June 6, and July 8, 1994, that Plaintiff's continuing complaints of upper extremity pain and weakness may represent work avoidance, Dr. Bernstein did refer Plaintiff to Dr. Visotsky who found that Plaintiff suffered from a torn rotator cuff, epicondylitis and carpal tunnel syndrome. (Tr. 81). It appears to this court that Plaintiff had cause to voice complaints regarding her right shoulder, arm and hand and that Dr. Bernstein may have been in error when he indicated that Plaintiff was attempting to avoid a return to work. Also, the ALJ's determination that Plaintiff's daily activities exceeded those expected of an individual with her alleged symptoms strains the bounds of logic. The ALJ asserts that by grocery shopping 2 to 3 times a month and having made the 90 mile round-

trip drive to the hearing, Plaintiff demonstrated that she was capable of sustained work activity. In *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000), the Seventh Circuit noted that a plaintiff's engaging in minimal daily activities does not establish that plaintiff's ability to engage in substantial physical activity. In this case, Plaintiff alleges the very minimum of daily activities and testified that the majority of household chores are performed by her son and husband. Plaintiff's ability to make a one time trip from her home to the hearing provides little, if any, evidence of her ability to function on a continuing basis in a work environment.

In spite of the reservations this court has as to these determinations by the ALJ, the ALJ's determination as to Plaintiff's physical RFC is supported by the record. Plaintiff's treating physicians stated that Plaintiff is able to return to work if she is not required to lift more than 10 pounds, perform overhear and frontal plane reaching and is not required to engage in repetitive activities. The ALJ's RFC determinations closely mirror the restrictions noted by Plaintiff's treating physicians.

Also, while this court is concerned about the reasonableness of the ALJ's determination that Plaintiff is capable of performing jobs involving some fine motor control in her right hand because she admitted she is able to pick a dime up off the floor, the ALJ's determination that Plaintiff is capable of performing a substantial number of jobs existing in the national economy is supported by substantial evidence. The ALJ did find at Step Two that Plaintiff suffered from bilateral ulnar neuropathies and Plaintiff's treating physician did indicate that Plaintiff has some problems with fine motor control in her dominant right hand. However, at the hearing the vocational expert (VE), in response to a question from the ALJ, stated that if the Plaintiff had the ability to pick a dime up off the floor, she would have the capability to perform the fingering functions required in the 7,200

22

usher and cashier jobs previously identified by the VE as jobs the hypothetical individual could perform. (Tr. 334). The VE also identified 2,100 guard/information clerk jobs that would not require fingering. (Tr. 334). While this court does have some reservations as to the determination that picking a dime up of the floor is equivalent to the type of potentially continuous fine motor manipulations required of a cashier or usher, the VE did identify 2,100 jobs that could be performed by an individual with Plaintiff's limitations, including an inability to perform fingering functions.

Plaintiff asserts that the ALJ failed to provide an accurate hypothetical to the VE and ignored the medical evidence of Plaintiff's mental impairment. (Plaintiff's Memorandum at 8, filed 12/4/2001). In the hearing decision the ALJ noted determined that the PRTF was considered and the psychologist's findings regarding Plaintiff's deficiencies in concentration, persistence and pace were rejected as unsupported. (Tr. 20). The ALJ did find that the updated Mental RFC was presumably more accurate and noted that that evaluation cleared Plaintiff for unskilled work. (Tr. 20). As to the finding that Plaintiff is moderately impaired in her ability to interact appropriately with the public, this court notes that no evidence in the record supports that finding. Plaintiff offered no testimony as to her inability to interact with the public and her attorney did not examine the vocational expert as to that point. None of Plaintiff's treating physicians indicated that Plaintiff may have any difficulties interacting with the public and, in fact, Plaintiff previous employment required constant interaction with customers. Substantial evidence exists to support the ALJ's decision not to include an inability to interact appropriately with the public in the hypothetical proposed to the vocational expert. Substantial evidence exists to support the ALJ's findings at Step Five. It is the Magistrate Judge's Report and Recommendation that the ALJ's determination as to Step Five of the analysis be affirmed.

23

## VII. CONCLUSION

In accordance with the above, the Magistrate Judge recommends that Defendant's motion for summary judgment be granted and Plaintiff's motion for summary judgment be denied.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 5/23/02

24